Would the attorneys who are going to argue the case please approach the bench and inform us of, identify yourselves please, and advise us how much time you'd like to argue. Good afternoon, your honor. My name is Mary Pat Baines, and I represent the plaintiff appellant Brian Harwell. And I would like to take 15 minutes plus three for rebuttal. Very well. Good afternoon, your honor. Perry Shores for the Appley Fireman's Fund Insurance Company of Ohio. And 20 minutes? 15 if that's all there is left? We allow you to complete your arguments. Okay. Very well. Thank you. Thank you. Ms. Benz. Thank you, your honor. May it please the court. Your honor, on behalf of Mr. Harwell, who is the judgment creditor and you're seeking enforcement on an insurance policy that was issued to an insured torch user, we are seeking reversal of the summary judgment that was entered in favor of the insurer and seeking that summary judgment be entered in favor of Mr. Harwell. This may seem like a unique case in some ways, but really it can be decided on basic, long, time-honored principles of insurance law going back to Maryland Casualty v. Peppers and long before that. What's unique? No court that either side has found has apparently construed a policy like this one. What else is unique? No court that I'm aware of, and Mr. Shorst may disagree, no court that I'm aware of has blessed, approved the kind of process that this case involved for this insurance company to essentially deny the duty to indemnify its insured and ultimately not to pay the judgment in favor of Harwell. Third, this case, fortunately, hopefully a rare case, involves an egregious, in my opinion, concealment of the insurance coverage that did not exist for the Harwell judgment. It was known as early by the insurance company as September 2008, four years before the trial, the accident trial, that they were going to not pay any judgment in favor of Harwell. And that is the September 2008 reservation of rights letter where they say this is our final position. We won't be paying more than $50,000. Under what, when should they have told you? Interrogatory answer or in a deposition? When was it, or amended interrogatory response? I know they said they had a million dollar policy, but what is it that you're contending should have been? We're contending that it should have been disclosed in an amended answer to an interrogatory. The interrogatory was in 2007. What I'm referring to as the final position letter was 2008. The trial was 2012. Disclosed to whom? Disclosed to Mr. Harwell, essentially to his trial counsel, which was not me, which was Mr. Farr. Right, right. That disclosure, whether it was in 2008 or 2009 or 2012, would have put Mr. Harwell's trial counsel on notice that, whoa, we have a problem here. We're looking at potentially a judgment in any amount that will be non-collectible, and we need to address that issue, okay? How would it have been addressed is a matter for any of us to speculate about, but one thing we know could have happened is there could have been a declaratory judgment then and there to declare the rights of the parties under this policy. There could have been a settlement conference. There could have been a mediation, which is often the way things like that, including insurance issues, get, the parties get put in a room and they have to disclose what are the actual policies, what are the risks that that interpretation of the policy will succeed, and what's that going to be the consequence to Mr. Harwell. All of this decision-making could have been made with the full knowledge of Mr. Harwell and his lawyer about what the risks were. Instead, somehow, through all of this time, they got to a trial without apparently ever having to come to a court or a mediator or an arbitrator and say, this is the limits of our coverage. It just didn't happen. Is that a discovery rule violation in that case? Is it an ethical violation in that case? I mean, I'm not clear what you're arguing. I wish I had a case here that I could say that leads to coverage in this case. I looked. I can't find it. And so what I'm saying is, if you keep that in mind in the context of the case, the nondisclosure, everything that wasn't known to Mr. Harwell and his counsel by the time they tried this case in 2012, that the basic rules of insurance coverage, which would require them to give a full and complete reservation of rights letter to the insured, they didn't do it, which would have required them to disclose the conflict of interest between this insurer that didn't intend to pay any judgment that might be entered against its insured, if that had been disclosed to the insured, then we would have had a different case because the insured would have said, I better get my own attorney and find out what's going on here. Even a judgment-proof party, who may or may not have been judgment-proof in 2008, is entitled to proper representation from the lawyer who's being paid by the insurance company and by the insurance company. I mean, they paid for a policy. They were entitled to be fully informed whether they're judgment-proof or not. There's no law that says that. You're contending they were not so informed? I'm sorry? You're contending that the insured didn't know this? Correct. Okay. There's certainly nothing in the record that shows communication from the insurer to the insured. That was part of the discovery. We have included all the correspondence we obtained between insurer and insured on this issue. And that would be a separate issue from whether the insurer had an obligation to disclose their position to the putative plaintiff seeking indemnity or recovery. Yeah, correct. We have not alleged or asserted, rather, that Fireman's Fund independently had that obligation. We have alleged that the lawyer who represented jointly the insured, Kipling, and the insurer, Fireman's Fund, certainly had that obligation. Obligation because he had an appearance on file and was the trial counsel, the sole counsel, really, in the accident case, in the tort case. That obligation existed in the tort case. Did this give him a conflict of interest? I'm sorry? Did this give him a conflict of interest? I certainly believe that the entire situation gave him a conflict of interest. And, yes, that is an ethical problem. And his representation, and I really don't mean to cast aspersions against him, but the history of it is his entire representation from 2008 on was tainted by what I believe to be, and we've argued, is a clear conflict of interest. That is an ethical violation. I don't know, I'm not suggesting it goes anywhere beyond this case. But, as I said before, even a judgment-proof, impecunious defendant who's a party in litigation is entitled to ethical representation from both the insurance company and from the lawyer it hires. And that ethical, that conflict, if we just take the conflict alone, that would have stopped the insurance company from denying coverage. So, that's a piece of it. Go back to the reservations of rights. If those were inadequate, and if there was harm because it was, if the insured relied upon the inadequacy of the reservations of rights to make decisions about the case, which all certainly they did because they ended up in a trial where their lawyer represented by, who represented both the insured and the insurer, ended up making arguments that would have, and if Fireman's Fund is correct, did, harmfully insure. What interventions did you look for to stop that? What interventions did you look for or try in order to stop that? All of this was accomplished completely without the knowledge of Mr. Harwell or his counsel. I'm not sure if I answered your question. So, it's basically unrepresented? Mr. Harwell had able trial counsel. Mr. Harwell's trial counsel relied on an interactory answer where it was stated that there was $1 million in coverage. He was, Mr. Frost, Mr. Harwell's trial counsel, was never informed of the conflict. The conflict was the insurance company told the lawyer for Kipling and Fireman's Fund, look, we're not going to pay any amount over $50,000. This is our final position. That lawyer goes and tries the case Harwell versus Kipling with, we say, a conflict, but undisclosed to Mr. Harwell, undisclosed to his trial counsel, Mr. Frost, undisclosed until this declaratory judgment suit when we request and get all of the communications between insured and insurer on the insurance issues and we find out we, I, counsel for Harwell, discover a conflict that existed years before. If we were to rule in their favor, do we have to find a conflict of interest? No, there are other... But one avenue you're saying is to find a conflict of interest, find that that being a conflict of interest would result in a reversal. Correct. That's one argument. That's one. So, starting at the beginning of the case, not in order of importance, we've got reservation of rights deficient, covered that. Conflict, covered that. Ambiguous policy language. This endorsement only applies in specific situations, in a specific situation, even though it's admitted that the insured did not purchase this insurance or get the indemnity agreement he was required to get. That doesn't force or require application of the endorsement. This very specific language does, specific to the ambiguous language, saying the occurrence, Mr. Harwell's accident, must involve a contractor, involve, as I'll explain, is not as clear as it might seem, and the violent injury must arise out of, quote, covered acts of such contractor. So, it's not completely true in all cases that this endorsement is going to apply, even though there was no compliance with the requirement to buy insurance. And so, the ambiguity here, at least in this case, is involving. What is it, an accident on a job site that involves a subcontractor? Well, does it involve a subcontractor when the finance fund lawyer says, the drywall people had absolutely nothing to do with that? So, was it involving the drywall contractor, or was it not? The other ambiguity is, what does it mean to have covered acts of such subcontractor? It's my position that an answer to the question, what does the word covered mean, has not been given. We've offered some different definitions. The insurance company says, no, no, it doesn't mean that. It just means anything that results in coverage for the insured. So, we contend that that is ambiguous, but even if we say, all right, contract to law, we'll ignore the word covered. It's superfluous. It means nothing. We'll just say it had to arise out of acts, acts of such subcontractor. So, now we're dealing with either one or two subcontractors never before identified prior to trial, and no acts of either one of them that caused the accident were proven at that trial. But they weren't defendants at the trial. They were not included in the trial. The trial was only against? That's correct. Only against Kipling. Kipling, I'm sorry. I've been confusing them all day. Kipling is the tortfeasor insurer. Yes. The only defendant. Right. Okay. You are correct, Judge, but the argument in the Fireman's Fund side is, well, the lawyer for Kipling Fireman's Fund had a defense in the accident trial that the accident was the sole proximate cause of the negligence of a subcontractor. All right? So, that defense was injected into the case by the defense, a lawyer who represented both the insurance company, who knew what the coverage issues were, and the insurer, who by this point apparently didn't care. And so, that issue was there. And it was argued to the jury, and the jury basically rejected it. Okay? And now that, the mere argument, the mere saying, well, there was evidence about this contractor, and it was argued to the jury, and they say our trial counsel, Mr. Harrell's trial counsel, Mr. Frost, he agreed that, well, maybe it was their contractor, but he said it didn't matter. The liability was solely on Kipling as the general. It didn't matter what the subcontractor said. Their argument, the arguments at their trial, are the basis for saying now that there's no duty to pay the Harrell judgment. And that theory came up two years after the trial in this declaratory judgment suit. That's what I'm talking about, a procedure that has no precedent that I'm aware of. You're talking now that that judgment is collaterally estoppel for your case here. That is another basis for saying there is no coverage, that we are entitled to coverage for the Harrell judgment. Because in that trial, the attorney for Kipling, who was also engaged by the insurance company, put before a fact finder that this injury was not caused by Kipling, it was caused by a subcontractor. And the jury found Kipling caused the injury, was the proximate cause of the injury. Correct. And was never asked by Fireman's or Kipling to determine whether the sole proximate cause were the subcontractor. Correct. And therefore, your position would be, so how can you now try to wiggle out of this indemnification contract where you failed to argue that in the first place? Yes. The judgment is binding. You can go the insurance law route through Murphy v. Erso, which we cite. You can go the River Park Res Churicada route, which we also cite. Either way, you come out with, we come out with the argument that the case was tried. And the insurance issues are bound up with the judgment, merged in the judgment. And you can't go behind the judgment to say, well, didn't you argue this? Look, that argument was made. Look, this guy testified. You can't do that. That would be retrying that case. And it can't be done under either law, insurance or just plain old Res Churicada collateral estoppel law. One point I want to make about using the judgment is that this argument has come up in the lower court in the briefs. It has never been Mr. Harwell's position that the jury should interpret the insurance policy. That's not the position. The jury should not be told of the insurance policy. That's not the position. The judge in that case might have been told about the insurance policy, but that would have disclosed the issues to Harwell. But it's really the fact issues. What caused? Whose acts caused Mr. Harwell's injuries? That was the issue in the tort trial. And that's been determined. And you say that's been determined, so we don't need to determine it again. That is our argument, yes. And I believe that is all I have to say other than to summarize and say the background in 9-9 involves this egregious concealment. None of us would be here today arguing about this if Mr. Frost and Mr. Harwell had been able to come to terms with whatever the coverage issues were at that time. And make some reasoned decision about proceeding in the case. But that never happened. And to allow this procedure with all of the legal basis we say require findings in Mr. Harwell's favor to be upheld would in fact condone that kind of concealment. I think the result of enforcing strictly reservation of rights laws, conflict of interest laws, ambiguity laws, and race judicata laws will make the point that this kind of concealment should not happen. Thank you.  Mr. Shores? May it please the Court. Since it's been emphasized so greatly, I'd like to first address this so-called egregious concealment issue. And I'd like to point out first, there's no precedent in Illinois, and frankly I don't think there is in any other state, that requires an insurance company to communicate its coverage position not only to the insured, but to any claimants out there as well. As a general matter. Number two, if we look at the specific interrogatory that was propounded in the underlying case, it doesn't show what counsel for Mr. Harwell is saying, that there was something concealed. The interrogatory says, and I'm going to quote it, were you named or covered under any policy of liability insurance effective on the date of said occurrence? If so, state the name of each such company, policy number, effective period, and the maximum liability limits for each person and each occurrence. It doesn't ask for the insurance company's coverage position. In fact, the fact that it asks either named or covered shows that the plaintiff, Mr. Harwell, wasn't interested in whether or not the policy was ultimately going to provide coverage. They just wanted the name of every insurance policy that was out there that covered Kipling in this case. Secondly, it refers to maximum liability limits. It doesn't say applicable liability limits. And in this policy, the maximum liability limits were a million per occurrence and 2 million general aggregate. And that's what was disclosed. And a third point I would make is to put on to the insurance defense counsel the obligation to somehow get involved in coverage issues and answering these interrogatories would create incredible ethical problems for defense counsel in putting them in the position of having to make representations about the insurance company's coverage position and essentially advocate for that coverage position in the context of the underlying case. And that's simply not the role of defense counsel, even when retained by the insurance company. Given that, what about the conflict of interest? Because that has nothing to do with the fact that there's a conflict of interest. Well, it's very easy to say conflict of interest. But Illinois is not a state where just because you assert a coverage defense, there's a conflict of interest. Also, not just because you issue a reservation of rights is there a conflict of interest. There has to be an actual conflict of interest. And the typical conflict of interest in Illinois is where you've got alternative theories of liability, one which is covered and one which isn't. The classic case is where there's one count for intentional conduct and one count for negligent conduct. And the theory is that defense counsel being controlled by the insurance company has the ability to steer the case either in or out of coverage by defending more vigorously the potentially covered count of the complaint. In this case, this isn't that situation. Here's a situation where, number one, this isn't a question of two theories of liability. This is just a matter of if the facts show that the case, that the occurrence involved a subcontractor and there were covered acts of the subcontractor that caused the bodily injury, then the endorsement is triggered. If that's the case, then what is the benefit to the insurance company for not having the subcontractors as part of that lawsuit in Will County? Wasn't it in the interest of firemen's to have the subcontractor there? They were. But they were originally named in the underlying suit. But I believe, and I'd have to go back and look, I'm not sure even if it's in the record, I believe one of them settled out and I believe the other one was voluntarily dismissed prior to trial. And that doesn't, voluntarily dismissed by whom? By the plaintiff. Well, did that preclude firemen from bringing them in? By the plaintiff. Is it a third party? My point is, is that it seems to me that in the best position of the insurance company, they're saying we have a duty to indemnify you, client, what's his name, Kipling, if you are at fault. However, if you are not at fault and the subcontractor caused this accident or contributed to it, we are not going to indemnify you because you didn't have the coverage. That's not really what the endorsement says. The endorsement isn't a, if you were, it applies if Kipling's not negligent but a subcontractor is negligent, or it doesn't apply if Kipling's negligent but a subcontractor isn't negligent. Negligence doesn't have anything to do with whether or not the endorsement applies. Kipling can be negligent for something that involved a subcontractor. That happens all the time. The general contractor is sued for failure to supervise or failure to direct the construction and is found to be negligent. That doesn't mean that the subcontractor wasn't involved in the occurrence. This has nothing to do with whether one party was negligent versus the other. There's not even a reference in the endorsement to negligence. The issue here is, and what's really frankly been misrepresented as to what, number one, what was presented at trial, but number two, what Fireman's Fund's position is with respect to the endorsement, is at trial, it wasn't, the issue wasn't that Kipling was presenting an argument that Kipling, that the flooring subcontractor was negligent and Kipling wasn't. The issue was, did Kipling have the requisite notice of the dangerous condition such that it could be charged with negligence that caused the bodily injury? And the two competing theories were the plaintiff said that it was the drywalling, the drywall subcontractor that moved the staircase several weeks before the accident. Therefore, Kipling either knew or should have known about the condition and did nothing about it. And Kipling's theory was it was the flooring subcontractor who was working that morning and therefore the staircase was moved in such a short period of time in advance of the accident that Kipling shouldn't be charged with negligence. So it's not the case of just because a subcontractor is negligent, Kipling's not. That's not what the argument was. It was a question of what kind of notice did Kipling have as to the dangerous condition. And what was uncontested in the trial was whether it was the flooring subcontractor or the drywall subcontractor, both parties agreed, it was effectively stipulated, that one of the subcontractors created the condition by moving the staircase. And the only disagreement at trial was, was it the one that did it three weeks or four weeks earlier and therefore Kipling had notice or was it the one that did it the morning of such that Kipling didn't have notice. So... And under those arguments, your position is, for firemen, that under either one of those scenarios, there is no coverage for Kipling because he didn't comply with the endorsement. Absolutely. I mean, Mr. Harrell's counsel stated himself at trial that there were only two possibilities. And there's two possibilities where one, the drywaller did it, or two, the flooring subcontractor did it. It doesn't matter which one did it for purposes of this endorsement. This endorsement says if a subcontractor was involved and you didn't meet all the other prerequisites, the limit is reduced to $50,000. So this isn't a case where a fireman's fund needed to affirmatively add one of the subcontractors to be able to establish some liability by one of those subcontractors in order to get this endorsement to apply. The endorsement applies because the facts, with or without them as parties, showed that this involved a subcontractor and that those acts caused the bodily injury, and therefore the endorsement applies to reduce the limit to $50,000. So under that reasoning, then there's no collateral stop because the issues are completely different. Well, exactly. And frankly, the issue, it's a confusing argument, to be honest with you, because collateral estoppel would mean that the issue was decided, and yet counsel appears to be stating or conceding that the issue actually wasn't decided. So I don't see how there can be collateral estoppel on an issue that wasn't decided. But more importantly, well, not more importantly, the issue was not decided, in fact. And to the extent it was decided, it was decided in favor of the plaintiff's theory because obviously to the extent that there was a judgment or a verdict in favor of the plaintiff, the assumption is that they bought the plaintiff's arguments, and the plaintiff's argument was that the drywall subcontractor moved the staircase. And they kept being blue about it. Right. Sure didn't know. So to the extent there's collateral estoppel, frankly, it's collateral estoppel against Mr. Howell, not against Firewoods Fund because the only thing that was possibly decided was the facts that work against Mr. Howell's theory. Which is in your favor. Right. Right. There was also, I just want to raise, I know it wasn't really raised in argument here, but it was raised in the briefs, this idea that even if Kipling had obtained insurance from the subcontractors, that that insurance wouldn't have applied. So this makes Kipling worse off than it would have if, or Firewoods Fund is better off than if Kipling would have complied and gotten insurance with the subcontractors. And Mr. Howell's argument is based on cases that talk about the sole negligence exception, both in additional insured endorsements and also in the anti-indemnity statute. And again, consistent with what I said before, the issue here isn't one of sole negligence. Nobody's established here that there either was or was not sole negligence on the part of Kipling. Even if there was negligence by Kipling, there could have been negligence by one of the other subcontractors. And at a minimum, that certainly wasn't established. And therefore, you can't say as a matter of law that if there was additional insured coverage, it wouldn't apply because of the sole negligence exclusion. At minimum, it's pure speculation that this other coverage wouldn't apply. We would have loved to have had the opportunity to go after other coverage, but it wasn't there. So unless the court has any other questions, based on everything in the briefs and what I've said this morning or this afternoon, I would ask that the court affirm the judgment of the trial court. Thank you. Thank you. Ms. Burns? Yes. First of all, let me address the accident trial. It is difficult to understand how this went down. I wasn't there. Neither was Mr. Shorst. So we're reading the transcript and we're looking at the documents. But it's clear that it was the defense raised by Kipling Fireman's Fund that this accident was solely caused, was the negligence of one of these contractors, whether it was the drywall contractor who had been off the site for three weeks or the flooring contractor who had been to the site more recently. Through the course of the trial, I can't speak to the decision making that was made. But at the end of the closing argument, the Wilson-Elser lawyer for Kipling Fireman's Fund said, well, you know what, it wasn't the drywall. It wasn't the drywall. That's just wrong. It was the flooring contractor. But what did he say? Why was it the flooring contractor? Because somebody messed with this staircase. And doesn't the testimony of the flooring contractor seem kind of suspicious to you? Do you believe them when they say they did not do it? So it was a lot of smoke and mirrors, no direct evidence of any acts of any subcontractor. Mr. Frost had to respond to this, and he said, well, maybe it was the drywall contractor, but it certainly wasn't the flooring contractor. So this issue of acts of subcontractors which fit into the endorsement was introduced by the defense. So what? I mean, the fact is that the issue as resolved in that case, it was not whether, except what counsel said, it was not whether Kipling was solely negligent. Therefore, that issue of its negligence wasn't decided. And so there's no collateral estoppel, in which case that determination still needs to be made. It's an open issue. And because of the lack of the insurance, Kipling's not covered. They're only covered up to $50,000. I mean, that's the argument. I understand. So what's your account? I would say that registered account in Murphy. And how's that? Plug in to solve the collateral estoppel problem. But I would move on and say, okay, I'll accept that. The Highwell judgment doesn't matter. So now we have to decide it somehow. So let's look at what Fundraise Fund says. There's no proof that any acts of any subcontractor caused Mr. Highwell's injuries. They go right to the transcript, and they look at the arguments. And they say, Mr. Frost's saying, well, it might have been the drywall subcontractor, but it wasn't the flooring subcontractor. Counsel for the insured in Fundraise Fund said, well, it certainly wasn't the drywall contractor. It must have been the flooring contractor. Because we have proof of it? No, but because their testimony was kind of, I forget the word he used, but it was real, suspicious, questionable. It must have been them, okay? But there is no finding. So let's say, is that enough? Is that enough? These statements made at a trial, all of which were made with Mr. Frost's lack of knowledge of what these arguments, these statements, the consequences they were going to have for the insurance coverage. His statements, like it might have been the drywall contractor, were going to deprive his client of insurance coverage. Well, how would he have done differently? I mean, you speculated that maybe subtle, maybe this or that. But if that was true, you're saying then he would have been stuck with the $50,000? No. If he got to a trial under that circumstance, he would have said, this is all on Kipling. There is not any evidence of any involvement of either contractor. And that was certainly a plausible argument based on the arguments that were made. There was not any evidence of any act, any act of any subcontractor that caused Mr. Harwell's injury. But there's no evidence of that at all? At all. I mean, none. As I understand it, it was either the one or the other subcontractor. The question with regard to Kipling was whether they were aware or should have been aware of what happened. But there was no evidence that they were in there, that they moved the stairway, that they had anything to do with that stairway. Kipling. All right. But what I'm saying is there was evidence of a condition that Kipling did not discover. That's the basis of the argument. That's right. That's the definition. Why does that mean from an insurance perspective where a requirements fund bears the burden of proof? Why do those statements meet that burden? Both sides say, well, this might have happened or that might have happened without any direct proof that the acts of any subcontractor caused Mr. Harwell's injuries. That's what the endorsement requires. And I think that's all I can say about that. One other point. I just want to read what the 2008, the final position letter says. We have it. Okay. It's in the reply brief. Yes. What page is it? It's on the reply brief. Page 3. Page 3. It's record site C00285. Thank you. And what I did in the reply brief is I put the question and answer in there and then I put the answer. And I would say to the court, any lawyer reading that interrogatory question and answer would think there was a million and that it was not reduced to 50 in this case. Just one more point on the conflict. But you did ask for the maximum liability limits for each person in each occurrence. Yeah. And then when it goes down to 2008, the finance front says to be insured, your coverage is reduced to a limit of 50,000. So what would be the maximum liability limit as of September of 2008? I would say you should have amended to put that in because that's a new maximum. That's our position. The concept, the ability to steer the case, this accident trial was steered. It was steered to throw in this stuff about contractors, subcontractors. No proof. They tried to prove it. They couldn't. But it was steered in. The insured went through their trial as hell with it, not knowing that all of this supposed evidence or the argument about subcontractors was intended to negate coverage for any judgment. And so it was a hence I win, tells you lose defense. Kipling was not negligent. That's our defense. But what really caused this accident was the negligence of X subcontractor. So if you can win that case for the insurer, the insurer wins no matter what. Did one of the subcontractors settle with the plaintiff? One did. I'm not sure which. But that wouldn't have prevented the argument that their negligence was a subproximate cause. Right. But it may have impacted on whether there was a settlement if the plaintiff was aware of the fact that this million-dollar coverage doesn't exist, it's only 50 if this reservation is correct as advanced by firemen, unbeknownst to me. Correct. And if suddenly they know, wait a minute, if we can prove the subcontractor who is insured really did cause this accident, then instead of that case being against Kipling only, it becomes against the subcontractor. And then at the end of the day, if you get a judgment against the subcontractor instead of settling or instead of voluntarily dismissing, you have a collectible judgment. Thank you. So it does impact? Yes. He's going to argue. He's going to argue. Yes, sir. Thank you. You're welcome. Thank you. Thank you both for an interesting argument and good briefs on the issues. We will take the matter under advisement and the court's stand on the reasons. Thank you.